# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| AMY COBURN, | ) |
| | ) |
| Plaintiff, | ) |
| | )  2:07-cv-00662-KJD-LRL |
| v. | ) |
| | )  **O R D E R** |
| PN II, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

Before the court is defendants' Motion for Monetary Sanctions for Intentional Destruction of Evidence (#77). The court has considered the motion (#77), plaintiff's Opposition (#83), defendants' Reply (#84), and the evidence adduced at a hearing on December 2, 2009.

## BACKGROUND

This employment discrimination action was removed to federal court on May 23, 2007. Petition (#1). On July 31, 2007, defendants, PN II, Inc., Pulte Home Corporation, and Pulte Homes, Inc. (collectively, "Pulte") propounded document requests which included a request to inspect plaintiff, Amy Coburn's ("Coburn") home computer. Mot. (#77) at 4; Exh. 1 to Mot. (#77) at ¶¶ 9-14. Coburn objected, in pertinent part, on the grounds that, "(1) her home computer contains matters not relevant to the proceeding before this Court; (2) her current employer is a business competitor of Defendants and computers in her possession, custody or control may contain trade secret or confidential information to which Defendants have no right of access. . . ." *Id.*

Over the next several months, Pulte and Coburn attempted to work out a solution to satisfy Coburn's legitimate privacy concerns while allowing Pulte the forensic examination it sought. Mot. (#77) at 4. Unable to reach an agreement, on December 31, 2007, Pulte filed a Motion to Compel

(#30), seeking, among other discovery matters, a forensic inspection of Coburn's home computer. This court granted the motion on March 28, 2008, and set forth a specific protocol for the parties to follow. Order (#41). As part of the Order (#41), the parties were to agree on a computer expert to perform the forensic examination, who would act as an officer of the court. *Id.* The parties subsequently entered into a highly detailed Stipulated Protective Order Governing Forensics Examination of Plaintiff Amy Coburn's Personal Computer(s) (#43), ("Forensics Order") which this court entered on May 9, 2008.

The parties agreed to use the computer firm, Vestige Ltd., to perform the forensic inspection. On May 9, 2008, a representative from Vestige made a clone of Coburn's home computer hard drive, and pursuant to the Forensics Order, performed a keyword search of the cloned hard drive and analyzed the data, metadata, and artifacts on the hard drive.[1] Mot. (#77) at 6-7. At the hearing, Vestige President/CEO, Damon Hacker ("Hacker") testified that the keyword list was designed to develop "a search strategy that finds the right information but at the same time tries to eliminate having a lot of false positives." He and defense counsel developed the list of keywords based on the Complaint and the EEOC filing, without input from plaintiff or her counsel, Robert Spretnak.

On June 25, 2008, Vestige sent its Electronic Evidence Production Summary ("Summary") to both parties, and pursuant to the Forensics Order, it sent the actual data to Spretnak for redaction. Exh. 13 to Mot. (#77). The Summary indicated that Vestige delivered to Spretnak data consisting of 5,413 files and 7,669 emails, all of which contained at least one of the key word search terms. *Id.* Of the 5,413 files that contained keywords, Vestige labeled 3,946 of the files "Non-Standard/ Corrupted Files/Unallocated Clusters" (collectively, "Non-Standard Files"), indicating that they are "portions of files that existed on the computer, but had been deleted prior to the creation of the Forensics Image."

---

[1] Artifacts are "data generated by the computer – including the operating system, file system, or applications – rather than by the user of the computer. . . . Metadata is electronically stored information that describes the history, tracking, or management of an electronic document." Declaration of Damon Hacker, Exh. 12 to Mot. (#77) at ¶ 4. "Metadata may include information on how, when and by whom a file was created, accessed or modified. Some examples include: a file's name, a file's location, . . . , file format or file type, file size, file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions (e.g., who can read the data, who can write to, who can run it)." Declaration of Damon Hacker, Exh. 12 to Mot. (#77) at ¶ 4.

2

Exh. 12 at ¶11.  Vestige could only retrieve portions of the data because, in Hacker's opinion, the computer's operating system wrote over portions of it.  *Id.*  Hacker explained, "it is possible that some of the 3,946 [files] . . . were deleted by the execution of CCleaner [a computer cleaning application]," but "[b]ecause of the large volume of Non-Standard/Corrupted/ Unallocated Clusters, it is likely that this content also included files that had been manually deleted."  *Id.*

Vestige's July 21, 2008 Report of Relevant Artifacts indicates that a computer cleaning program, CCleaner, was run on Coburn's computer on May 7, 2008 – two days prior to the court-ordered forensics examination.  Exh. 14 to Mot. (#77) at 6.  In addition, the default configuration settings for CCleaner were manually modified at that time to add google toolbar.  CCleaner had only been run twice since its installation in 2006 and was not set to run automatically, nor was the computer set to run CCleaner automatically; rather the program had to have been run manually.   Coburn represents that she became aware of the existence of CCleaner on her home computer only as a result of the forensic exam, after which she learned that CCleaner was installed on her  home computer as part of a service package she purchased from "My Computer Works" in July, 2006.  *Id.* at 11; Exh. 1 to Opp'n (#83) at ¶ 6.  It is unknown who ran CCleaner, who made the change to the default settings, or whether either of these actions were initiated remotely by My Computer Works.

Based largely on the outcome of Vestige's forensics exam, Pulte argues that Coburn "not only failed to preserve relevant evidence after the duty to do so had arisen, she intentionally and repeatedly destroyed such evidence."  Mot. (#77) at 11.  Pulte previously moved to dismiss the action as a sanction for spoliation of evidence while its motion for summary judgment was pending.  While granting the Motion for Summary Judgment, Judge Dawson stated, "The [] allegations [of destruction of evidence] are sufficient that the Court would have held an evidentiary hearing were summary judgment not to be granted.  Such a hearing may still be necessary in the event attorney fees or sanctions become an issue."  Order (#68) at 9.  The court then denied "the Motion to Dismiss as moot, but without prejudice to renewal on proper showing."  *Id.*  Pulte now moves this court for monetary sanctions against Coburn for intentional spoliation of evidence.  Pulte estimates that it has incurred more than $150,000 in costs

3

and fees as a result of plaintiff's alleged discovery violations. Mot. (#77) at 16 n.10.

Three main allegations underlie Pulte's motion for sanctions pursuant to Rule 37 and the court's inherent power: (1) the running of CCleaner on Coburn's home computer on May 7, 2008 indicates an intent to destroy relevant evidence and was a direct violation of the Forensic Order; (2) the existence of the 3,946 Non-Standard Files, all of which contain keywords purportedly relevant to the litigation, indicates that Coburn regularly destroyed relevant evidence on her computer; and (3) Coburn destroyed relevant emails on her home computer between December, 2005 and April, 2006. Pulte additionally notes that Coburn has admitted to destroying audio tapes of secretly recorded conversations between her and some of her co-workers.[2]

Coburn does not deny that CCleaner may have run prior to the forensics inspection but states that she never deleted a large volume of files from her computer, nor did she instruct anyone else to do so. Aff. of Coburn, Exh. 3 to Opp'n (#83) at ¶¶ 8-9. She argues that, in any event, the normal operation of CCleaner would fall within the "safe harbor" from sanctions provided by Rule 37(e). Finally, Coburn maintains that while she may have deleted emails from her home computer, she did so only after downloading and saving the contents to folders on her home computer, and that she did not delete any Pulte-related documents after May 23, 2007. Coburn admits to destroying some of the audio tapes.

## DISCUSSION

Spoliation is the intentional destruction, mutilation, alteration, or concealment of evidence that may be used by another party in pending or future litigation. *7-37A Moore's Federal Practice - Civil* § 37A.55. A party is not required to retain every document in its possession but must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence. *Id.* Monetary sanctions are available for obstruction of discovery and/or destruction of evidence under both Rule 37(b) and the court's inherent powers. *See Chevron U.S.A., Inc. v. M&M Petroleum Servs.*, 2009 U.S. Dist. LEXIS 68829 at *61 (C.D. Cal. August 6, 2009).

---

[2] The evidentiary hearing was limited only to the question of alleged intentional spoliation of evidence regarding deleted and/or corrupted information on Coburn's home computer.

4

Pursuant to Fed. R. Civ. P. 37(b)(2)(C), the court may impose monetary sanctions for failure to comply with a court order. If a party has failed to comply with a discovery order, "it becomes incumbent upon the disobedient party to show that his failure is justified or that special circumstances would make an award of expenses unjust." *Id.* (quoting *David v. Hooker, Ltd.*, 560 F.2d 412, 419 (9th Cir. 1977). Notably, willfulness is not a necessary element for the imposition of expenses and attorney's fees under Rule 37. *Id.* at *61-62. To warrant sanctions for spoliation under Rule 37, clear and convincing evidence is required. *7-37A Moore's Federal Practice - Civil* § 37A.55. In general, the responding party's culpability and the level of prejudicial harm caused by the destruction of relevant evidence are the most significant factors in determining the severity of sanctions to be imposed. *Id.*

Rule 37(e) provides a "safe harbor" from sanctions to a party who fails to provide electronically stored information.[3] Rule 37(e) provides, "Absent exceptional circumstances, a court may not impose sanctions . . . on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." If the routine operation of the computer system is likely to destroy electronically stored information that is relevant and not otherwise available on another source, a party must place a litigation hold suspending the destruction. The destruction of emails as part of a regular good-faith function of a software application may not be sanctioned absent exceptional circumstances.

Under its "inherent powers," a district court may award sanctions in the form of attorney's fees against a party or counsel who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (citation omitted). Before awarding such sanctions, however, a court must make an express finding that the sanctioned party's behavior amounted to "bad faith." *Leon v. IDX*, 464 F.3d at 961. A party "demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* Even if the court finds such "bad faith," the amount of monetary sanctions must be "reasonable." *Id.*

---

[3] While Rule 37(e) is more readily applicable to larger scale "electronic information systems," Coburn asserts, and Pulte does not dispute, that the Rule is also applicable to her home use of an electronic information system.

1   A party's destruction of evidence qualifies as "willful spoliation" if the party has "some notice
2   that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464
3   F.3d at 959 (emphasis in original) (citations omitted) (holding that inasmuch as Leon "knew he was
4   under a duty to preserve all data on the [work] laptop," he engaged in willful spoliation when he
5   intentionally deleted files, then wrote a program to overwrite the deleted documents). The duty to
6   preserve relevant evidence can arise even before litigation commences, and sanctions may be imposed
7   if a party knew or should have known that the evidence was potentially relevant. *United States v.*
8   *Maxxam, Inc.*, 2009 U.S. Dist. LEXIS 30743 at *21 (N.D. Cal. March 27, 2009). It is not necessary that
9   the specific evidence has even been requested, and even "personal" documents may trigger a duty of
10  preservation. *See id.; see also Leon*, 464 F.3d at 961 (rejecting Leon's argument that documents he
11  deleted and wrote over were not relevant because they were "personal," observing that "'personal'
12  documents are highly relevant to an employment discrimination claim'").

13  Pulte urges the court to levy heavy monetary sanctions on Coburn for intentional spoliation of
14  evidence. The thrust of Pulte's argument is that CCleaner was run on Coburn's computer two days prior
15  to the forensics exam; 3,946 Non-Standard Files containing keywords were discovered; and Coburn
16  allegedly destroyed relevant discovery in the form of emails she sent and received prior to March 23,
17  2007 (most significantly, those sent and received between December, 2005 and April, 2006). Def. Arg.
18  (#91) at 2. Pulte notes, also, that Coburn admitted to destroying some tape recordings she secretly
19  made while speaking to coworkers.

20  **A. The Effect of Running CCleaner**

21  The fact that CCleaner was run on Coburn's computer two days prior to the court ordered
22  forensics exam, standing alone, certainly gives rise to a suspicion that spoliation occurred, as does the
23  specter of nearly 4,000 destroyed files that contain "key words relevant to the litigation." It is not clear,
24  however, that the running of CCleaner on May 7, 2008, resulted in the destruction or overwriting of
25  relevant documents. It very likely did not. The testimony adduced at the hearing indicates that
26  CCleaner likely did not result in spoliation of evidence relevant to the litigation. Pulte nevertheless

6

contends that the running of CCleaner cleaned the "registry," thereby reducing Vestige's ability to determine what other applications, such as wiping programs, were installed and run prior to May 7, 2008. This may be. Still, the question of who actually ran the cleaning program on May 7, 2008 is unresolved. Coburn categorically denied having done so. The record is simply without clear and convincing evidence that Coburn violated the Forensics Order by herself running or directing someone to run CCleaner on May 7, 2008. The court is therefore not convinced that the running of CCleaner alone compels the conclusion that Coburn destroyed relevant evidence "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Leon*, 464 F.3d at 961.

**B. The 3,946 Non-Standard Files**

Pulte is unable to establish that the 3,946 Non-Standard Files represent intentional destruction of relevant evidence. Hacker opines that the 3,946 Non-Standard Files were intentionally deleted from Coburn's computer, because "the location of the search terms . . . on the computer" indicated "the original files that contained the search terms were once "active files" on the computer's hard drive." Exh. 12 at ¶13, ¶10. Vestige could only retrieve portions of the data because, in Hacker's opinion, the computer's operating system wrote over portions of it. *Id.* Hacker continues, "[b]ecause of the large volume of Non-Standard/Corrupted/ Unallocated Clusters, it is likely that this content also included files that had been manually deleted." *Id.*

Coburn submitted the available evidence on this issue to Patrick Fry ("Fry"), a computer consultant, who also testified at the hearing. Fry stated, "[i]t would be expected that a computer in regular use for years would have thousands of [such Non-Standard Files]." Exh. 10 to Opp'n (#83) at ¶ 10. Hacker similarly testified at the hearing that the number likely represents only a small fraction of such files on the computer. According to Fry, this is because an internet browser alone may maintain thousands of cached files at any one time and the Windows operating system itself automatically generates temporary files and logs, all of which may interfere with the use of the computer by making it sluggish. *Id.* at ¶ 5. Fry further testified at the hearing that while many such files are technically "intentionally deleted," they are not necessarily *volitionally* deleted; meaning that the computer may

7

delete the files without any user intervention.  Therefore, Fry maintains, "the raw number of Non-Standard Files/Corrupted Files/Unallocated Clusters in no way conveys how, when, or in what manner files were created, used or deleted." *Id.* at ¶ 10.

Pulte argues that even though the number of Non-Standard Files may represent only a small portion of all such files on the computer, it is significant that every Non-Standard File contained keywords relevant to the litigation.  That the 3,946 files all contain "keywords" relevant to the litigation is not particularly significant, inasmuch as the chosen keywords very likely returned numerous "false positives" due to the inclusion of Coburn's husband's name in the list of keywords.  Hacker testified that he intentionally did not include "Coburn" as a keyword in the keyword search, because as a user of the computer, the name would produce "too many false positives."  Coburn's husband is named Michael Kelly Barnard.  The names, "Kelly" and "Barnard" were both in the keyword search list.  Def. Exh. 35.  When asked whether the use of these keywords could have inflated the number of Non-Standard Files with keyword hits, Hacker admitted that they could.

Notably, the papers submitted in this matter and the testimony adduced at the hearing indicate that nobody knows which keyword(s) are in any single Non-Standard File, and therefore how many of these files contain "false positives."  Pulte notes that when four or five of the Non-Standard Files were viewed during the hearing, one contained the string, "EEOC does not provide blank charge forms," indicating that relevant evidence on Coburn's computer had been deleted.  None of the testimony adduced at the hearing, however, sheds light on the meaning of this file as it pertains to spoliation.  The string could represent a temporary internet file created when a user looked at the EEOC website, or it could represent a portion of a document; if it was once a document, it could have been deleted by Coburn or it could have been deleted by Coburn's husband, and there is no telling when.  Pulte urges the court to derive from this EEOC fragment, that potentially one in four Non-Standard Files represents a relevant file which was intentionally destroyed by Coburn and to levy sanctions accordingly.  *See* Def. Arg. (#91) at 7.  This the court cannot do.  To do so would be to levy sanctions on the basis of an evidentiary estimate or "hunch."

8

**C. The Emails**

Pulte next argues that Coburn either failed to preserve or intentionally destroyed email relevant to the litigation after her duty to preserve such information was triggered – most significantly those between December 2005 and April 2006. Coburn freely admits that she deleted emails which may have at one time contained information relevant to the litigation, though she claims that she did not delete any Pulte-related documents after May 23, 2007 – the date the action was removed to this court. Coburn testified at the hearing that she regularly sent email from her Pulte account to her home email account which contained information she thought might be relevant to prove discrimination. For example, Coburn emailed her performance review to her home account, as well as business plan or other work projects that she turned in at Pulte. She testified that it was her practice to download whatever she'd sent to her home computer, then delete the email and retain the information in labeled folders on her hard drive. Similarly, there is evidence that Coburn, in her final days at Pulte, downloaded a large amount of files from her Pulte computer and then uploaded those files onto her home computer. Coburn's practice was to then delete any duplicative emails or files. All of the information was saved on her home computer. It is undisputed that Coburn produced this information.

Pulte points to evidence gained through third-party subpoenas and the forensic exam of emails it believes should have been produced by Coburn. *See* Mot. (#77) at 23-24; Exh. 30 to Mot. (#77). The content of the email indicates that while "personal" matters were at the heart of the communication, there was also conversation related to Pulte and the subject of this litigation. Pulte also notes that at one time Coburn told a coworker that she had "every email that I ever had, since starting here" on a DVD that she had made in November, 2005. As it turns out, however, the DVD was not readable on her home computer. Finally, Pulte asserts that while "in excess of 7,000 emails were located on Plaintiff's computer, only a small fraction of these are dated during the last five months of her employment," the implication being that Coburn must have hidden or destroyed them.

Pulte's protest that, in essence, it should have received more emails from a specific time period, is insufficient to support a claim that Coburn intentionally destroyed relevant evidence to be gained

9

from the emails. *See United States v. O'Keefe*, 537 F. Supp. 2d 14, 22 (D.D.C. 2008); *see also Margel v. E.G.L. Gem Lab Ltd.*, 2008 U.S. Dist. LEXIS 41754, at *3 (S.D.N.Y. May 29, 2008) ("[u]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production . . ."). Perhaps the wiser decision would have been to retain the emails, even though the information contained therein allegedly had been downloaded to her computer; surely had Coburn retained the emails, this matter would not be for the court to consider. The court acknowledges that this is a close issue; however, the court does not find that the evidence before it warrants the imposition of sanctions with regard to the alleged spoliation of email evidence.

**D. The Audio Tapes**

Coburn testified at her deposition that she destroyed tapes she made of conversations with some of her coworkers, because they were of "poor quality." Mot. (#77) at 12. Coburn ought not to have destroyed the tapes. She specifically made the tapes in order to preserve potentially relevant evidence. Her testimony that they did not contain any relevant information, inasmuch as they were of too poor a quality to understand, does not alter her duty to preserve them. To be sure, their destruction concomitantly destroyed any ability to determine their relevance. Coburn should have produced the "poor quality" tapes instead of simply destroying them. The court thus finds that Coburn failed in her duty to preserve evidence and will be sanctioned accordingly.

Coburn intentionally destroyed the tapes, though not necessarily with the intent to deprive Pulte of relevant evidence. Thus, although the court does not find that Coburn acted in bad faith when she destroyed the tapes, she did fail to preserve the evidence after her duty to do so was triggered. Hence, pursuant to the court's inherent powers to impose sanctions, the court shall impose reasonable monetary sanctions in the form of attorney's fees against Coburn for failing to preserve evidence in relation to this litigation. The assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party. *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 288 (E.D. Va. 2001). The level of prejudice, if any, that Pulte suffered due to the

destruction of the tapes is not alleged, and appears to be minor.

Accordingly, and for good cause shown,

IT IS ORDERED that defendant's Motion for Monetary Sanctions for Intentional Destruction of Evidence (#77) is granted, but only to the extent that plaintiff shall, not later than October 22, 2010, pay to defendants the sum of $1,500.00 as the reasonable attorney's fees incurred in making the motion.

DATED this 30th day of September, 2010.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**